B.T. Moss was convicted for the capital murder of Betty Jean Bailey and sentenced to life imprisonment without the possibility of parole. Four issues are raised on this appeal from that conviction.
 I
Moss contends that there was no probable cause to support the search warrant obtained to search his residence. We disagree.
On the same day the crime was committed, Montgomery Police Officers J.A. Hamner *Page 131 
and K.G. Ingle obtained a search warrant from a municipal court judge. In their affidavit, they stated the following facts. Sometime after 4:00 on the morning of July 13, 1985, the police learned that Moss had been shot. Moss said that he had been shot by unknown subjects while at Ms. Bailey's residence. The police went to Ms. Bailey's residence and discovered Ms. Bailey in an upstairs bedroom. She was bound with nylon cord and had been shot several times. A .32-caliber revolver, from which three shots had been fired, was located beside her body. At three o'clock that afternoon, in a small wooded area approximately thirty-five yards from Moss's residence, the police discovered "a hooded jacket with a bullet hole in the hood and a bullet hole in the chest, a tee shirt with two holes cut out, one small caliber slug, one pair of gloves, a pair of socks with blood stains and oil, a . . . .357 handgun, a knife, and several live rounds of ammunition."
At the hearing on the motion to suppress, Officer Ingle testified to the following additional facts. The police knew that Moss knew the victim "real well." A small caliber handgun had been fired in the victim's bedroom and it appeared that Moss had been shot twice with a small caliber weapon. The victim appeared to have been shot with a large caliber handgun. The bullet holes in the clothing discovered in the wooded area near Moss's residence matched Moss's injuries. A .32-caliber slug was found in the clothing. The clothing and other items were located approximately half way between the victim's residence and Moss's residence. Moss gave the police several accounts of how he had been shot. "[T]he several stories he gave did not add up, they didn't make any sense, they were real contradictory to each other."
Under the totality-of-the-circumstances test for making the practical, common sense determination of probable cause ofIllinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527
(1983), the police had probable cause to believe that Moss was directly involved in the victim's murder and that evidence of his crime might be located in his residence.
The difficulty in this case is that the affidavit should have been more detailed and explicit. However, Officer Ingle testified that, in conjunction with the facts contained in the affidavit, he was "sure" he supplied the judge with additional information but he "couldn't tell you exactly what was said."
 "THE COURT: Did you tell him all about the statements and not making sense and so forth and so on?
 "THE WITNESS: I'm sure that was mentioned. I don't remember exactly what was said but I knew we probably elaborated."
Officer Ingle also testified that the municipal judge "had several questions."
We are not prepared to find that Officer Ingle's affidavit was totally deficient and insufficient to support a finding of probable cause in and of itself. However, even "[a] 'bare bones' affidavit can be validated if it is supplemented with additional facts which the magistrate considered before determining that probable cause was present." Crittenden v.State, 476 So.2d 632, 634 (Ala. 1985).
Moreover, even if the affidavit were found to be invalid so that it would not support a finding of probable cause, we would still find that the seized items were properly admitted into evidence because the officers exercised good faith in obtaining the search warrant. The Fourth Amendment exclusionary rule should not be applied so as to bar the use in the prosecution's case in chief of evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be invalid.United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405,82 L.Ed.2d 677 (1984); McBride v. State, 492 So.2d 654, 658 (Ala.Cr.App. 1986). Although the "good faith" exception does not apply to a "bare bones" affidavit or one so lacking in indicia of probable cause as to render official belief in its existence unreasonable, the affidavit in this case was not *Page 132 
so lacking. Crittenden v. State, 476 So.2d at 635.
 II
Moss was convicted of the capital offense defined in Alabama Code 1975, § 13A-5-40(a)(4): "Murder by the defendant during a burglary in the first or second degree or an attempt thereof committed by the defendant." He argues that his motion for a judgment of acquittal at the close of the State's evidence should have been granted because there was no evidence that he was guilty of burglary. In particular, he contends that there was no evidence that he unlawfully entered or remained in the victim's residence.
The State's evidence shows that, after Moss had been shot but before the police and paramedics had arrived, he went to the residence of Mary Davis and Katie Stallworth, which was located about "three doors down" from his own residence. He told Mrs. Davis that he had been "ambushed" at the victim's house. He gave Ms. Stallworth a key and told her to keep it for him and not to give it to anyone. It was later determined that this key fit the victim's residence.
The victim's brother testified that the victim and Moss grew up together and had been called "cousins," although he did not know whether or not there was any actual relationship. Once or maybe twice a week, Moss would be at the victim's house.
Joanne Blackmon, the victim's first cousin, testified that the victim was dating Ceotis Baker at the time and that the victim had never dated Moss.
On the night of July 12, 1985, Ms. Blackmon, her aunt, Willie Mae Morrow, and the victim went to the dog track. Afterwards, they returned to the victim's residence. The victim did not go with Ms. Blackmon and Ms. Morrow to the Goal Post because she "was waiting on company."
The victim's brother lived in the same residence with the victim. On the night of July 12th, he locked the doors to the house and left the victim alone after Ms. Blackmon and Ms. Morrow departed.
Montgomery Police Officer D.T. Marshall testified that during his investigation, Moss
 "told me that he had awakened about three o'clock in the morning and he found a note. He said he read the note, stated something to the effect that his cousin Betty Jean Bailey was in some type of need of help and he was to go over to her apartment. Said he also found a key along with the note. When questioned further about what had happened he said he went over there — well, he gave two or three stories First he said he went over there and one black male shot him. When questioned further for a description and what have you he said there were two black males and a black female had shot him."
* * * * * *
 "[H]e gave me two stories. One, that he had made it up to the top of the stairs and she was tied up and had been shot, . . . And then also another story that he didn't make it up the stairs and he had been shot."
Officer Marshall went to the victim's residence. The front door was locked. The back door was open. There were no signs of forced entry.
The victim was found in an upstairs bedroom. There were signs that there had been a struggle. The victim had been shot three times and cut on her wrist. There were no signs of forcible sexual intercourse in that there were no signs of injury to the genitalia. A nylon rope was loosely tied around the victim's left ankle, run up behind her back and wrapped three or four times around her neck and then tied to her right wrist.
Examination of body fluids revealed that the victim had engaged in sexual intercourse and that the secretions were consistent with Moss's blood type.
A mask made from a portion of a tee shirt was among the clothing found near Moss's residence. The remaining portion of the tee shirt was found in Moss's residence. Sewing thread consistent with that used in making the mask was also found in *Page 133 
Moss's residence. Evidence of clothing fibers connected Moss to the clothing found in the woods and placed him at the scene of the murder. There was scientific evidence that both the victim and Moss had fired a weapon.
Moss contends that there was no evidence of burglary. Although the evidence that Moss entered or remained unlawfully in the victim's residence is circumstantial and is far from overwhelming, it is sufficient to support the inference that he did so. Moss did not live in the victim's residence. The house was locked. Although the victim was expecting company, she was and had been dating someone other than Moss. There were no signs of forced entry. There was evidence from which the jury could reasonably infer that Moss went to the victim's house prepared to commit a crime and that Moss wore a mask and a hood and was armed when he killed the victim. There was evidence of a violent struggle during which gunshots were fired by both the victim and Moss, both of whom were injured. In a statement to the police, Moss alleged that someone had left him a key to the victim's residence. He also stated that the door to her house was unlocked.
A similar factual situation and issue were presented inJohnson v. State, 473 So.2d 607, 609-611 (Ala.Cr.App. 1985). In holding that the evidence was sufficient, this Court observed:
 " 'A person "enters or remains unlawfully" in or upon premises when he is not licensed, invited or privileged to do so.' Ala. Code 1975, § 13A-7-1(4). 'A person who is licensed or privileged to enter premises cannot, therefore, commit criminal trespass or burglary under the proposal. Of course, a person who gains admittance through intimidation, deception, trick or artifice does not enter with "license or privilege." ' § 13A-7-1, Commentary.
 " 'A conditional or restricted consent to enter land creates a privilege to do so only in so far as the condition or restriction is complied with.' 1 Restatement of Torts 2d § 168 (1965). 'One whose presence on land is pursuant to a consent which is restricted to conduct of a certain sort, is a trespasser if he intentionally conducts himself in a different manner.' Id. at 312. 'A consent is terminated when the actor knows or has reason to know that the possessor is no longer willing that the actor shall enter or remain on the land.' Id.
at 315. Consent induced by defendant's 'conscious misrepresentation as to the purpose for which admittance to the land is sought, may be a fraudulent misrepresentation of a material fact.' Id. at 318.
 "Clearly, the defendant 'remained unlawfully' in the dwelling from the point at which he decided to commit a felony."
* * * * * *
 "In the case before us, the fact that Mrs. Jones terminated Johnson's license or privilege to remain on her premises can be inferred from the circumstances that a struggle took place and that she was beaten."
* * * * * *
 "In our judgment, the State presented proof of the element of entry or remaining unlawfully through the testimony and documentary evidence describing the condition of Mrs. Jones's house and body. Deputy Coroner Clarence Haynes stated that the curtains had been 'pulled to the side as if . . . in a scuffle or something.' (R. 28). He also noted 'obvious scuff marks' on the floor (R. 37), a blood stain and a 'crushed-in' place on the bedroom wall depicted in State's Exhibit 3 (R. 24-25), and an overturned table pictured in State's Exhibit 4 (R. 25). The prosecution also introduced several photographs depicting the bloody and battered state of Mrs. Jones's body. Under the circumstances, we find that the corpus delicti of burglary, specifically the element that the defendant 'enters or remains unlawfully in a dwelling,' was proved prior to the introduction of Johnson's confession." Johnson, 473 So.2d at 609-611.
"[P]roof of lack of consent [by the owner of the premises to the entry] is not indispensable to a conviction of breaking and entering with intent to steal, but assuming that it is, such nonconsent may be established *Page 134 
by circumstantial evidence." Davis v. State, 44 Ala. App. 284,289, 207 So.2d 649, 653 (1967), cert. denied, 281 Ala. 718,207 So.2d 656 (1968).
The jury could have found Moss guilty of burglary even if they believed that the victim had given him a key to her house. The fact that one may lawfully enter premises for some reasons on given occasions does not provide the authorization to enter those same premises for other reasons on different occasions. See Mote v. State, 28 Ala. App. 68, 70, 180 So. 110, cert. denied, 235 Ala. 519, 180 So. 112 (1938).
"If there is a reasonable inference to prove the existence of the corpus delicti the Court should submit to the jury for consideration the question of the sufficiency and weight of the evidence tending to support that inference." Scruggs v. State,359 So.2d 836, 842 (Ala.Cr.App.), cert. denied, Ex parteScruggs, 359 So.2d 843 (Ala. 1978). Here, the evidence was sufficient, as a matter of law, for the jury to conclude beyond a reasonable doubt that Moss was guilty of the capital offense.Cumbo v. State, 368 So.2d 871, 874-75 (Ala.Cr.App. 1978), cert. denied, Ex parte Cumbo, 368 So.2d 877 (Ala. 1979). The jury was not "forced to speculate" on how Moss gained entry to the victim's house because its finding of guilt "is based on the 'inference of a fact in issue which follows as a natural consequence according to reason and common experience from known collateral facts.' " Ex parte Mauricio, 523 So.2d 87
(Ala. 1987).
 III
Moss argues that the jury committed error in their verdict because under the evidence they should have found him not guilty by reason of insanity.
At trial, Dr. Merle Wright testified as a defense witness. Dr. Wright had a doctorate in counseling and was employed by the Montgomery Area Mental Health Authority. In August of 1985, he examined Moss at the request of the trial judge and found that Moss "appeared to be rather vague, grandiose in his thinking. Thought processes appeared to be somewhat disorganized to the extent that [Dr. Wright] thought he should go to Taylor Hardin Secure Medical Facility for a more in depth evaluation of his mental status." Dr. Wright only concluded that "he appeared to be suffering from some mental illness at that time," and not that he was mentally ill.
Moss was admitted to Taylor Hardin on December 2, 1985. On December 5, 1985, he was diagnosed by staff psychiatrist Kanal A. Nagi as suffering from "paranoid schizophrenia, chronic type with acute exacerbation." The Lunacy Commission Evaluation report is dated August 15, 1986. The report found that Dr. Nagi's "diagnosis may be accurate but at this time it is felt by this examiner [Dr. Bernard Bryant] that it might be questionable." It was also noted that Dr. Nagi's "mental status exam was done on 12/5/85, approximately five months after the alleged crime so it was possible that the patient decompensated while being incarcerated." The evaluation report of the lunacy commission concluded:
 "In summary, there is [no] history of any previous psychiatric illness or treatment although the patient has been diagnosed as paranoid schizophrenic on 12/5/85. It should be noted that the patient was not suffering from any psychotic symptoms at the time of the crime according to the records. Therefore, it is felt that the patient was not experiencing any psychotic symptoms at the time of the crime and was aware of the situation in which he was involved. While it is ultimately the responsibility of the Judge or jury to determine the mental state of an offender at the time of an alleged crime, the present investigation failed to reveal any evidence of psychological abnormality in Mr. Moss at the time of the alleged crime."
Moss was found competent to stand trial.
Moss testified that he believed in voodoo and practiced "supernatural." Moss stated, "Well, I don't call it voodoo, I call it supernatural. Other people call it voodoo."
The evidence of Moss's insanity was not "so strong and overwhelming that it mandated the jury find appellant was insane at *Page 135 
the time the crime was committed." Ex parte Turner,455 So.2d 910, 913 (Ala. 1984); Christian v. State, 351 So.2d 623, 624
(Ala. 1977).
Here, there was evidence that Moss was insane five months after the crime was committed. There was also evidence that around the time of the crime Moss was engaging in some unusual and bizarre conduct. There was no strong and overwhelming evidence that he was legally insane at the time of the crime. Even the evidence that Moss was insane five months after the crime does not compel the conclusion that he was insane when the murder was committed. "The rule that insanity once shown is presumed to exist only arises in cases where the insanity is continuing and permanent in its nature, or where the cause of the disorder is continuing and permanent." Carey v. State,361 So.2d 1176, 1178 (Ala.Cr.App. 1978), cert. denied, Ex parteCarey, 374 So.2d 332 (1979) (emphasis added).
"[A] belief in witchcraft does not make one insane, just as belief in other faiths and religions [or cults] which deal in mysticisms and rituals does not per se make one insane."McCord v. State, 507 So.2d 1030, 1032 (Ala.Cr.App. 1987). "Unusual or weird behavior alone cannot be equated with mental insanity." Meredith v. State, 370 So.2d 1075, 1078
(Ala.Cr.App.), cert. denied, 370 So.2d 1079 (Ala. 1979). See also Young v. State, 428 So.2d 155, 160-162 (Ala.Cr.App. 1982). The evidence in this case was not so overwhelming that Moss was entitled to a directed verdict of acquittal on the ground of insanity.
 IV
Moss argues that his conviction should be reversed because the form of the verdict is improper and because the verdict did not refer to any specific count of the indictment.
The indictment against Moss contained seven counts. The first two counts each alleged a murder committed during a burglary in the first degree in violation of Alabama Code 1975, §13A-5-40(a)(4). Counts three, four, and five each alleged a murder during a kidnapping in violation of § 13A-5-40(a)(1). Counts six and seven each alleged a murder during a rape in violation of § 13A-5-40(a)(3).
The trial judge instructed the jury that one of the possible verdicts was, "[W]e, the jury, find the Defendant guilty of both murder and burglary and therefore find him guilty of capital murder." The jury's verdict was in that same form: "We, the jury, find the Defendant guilty of both murder and burglary and therefore find him guilty of capital murder."
There was no objection to either the oral instructions of the trial judge on this matter or to the verdict itself. Although grounds of the motion for new trial included the allegations that the verdict of the jury is contrary to the evidence and to the law in this case, no specific objection was raised to the form of the verdict.
Clearly, the jury's verdict was not in the proper form,compare Watters v. State, 369 So.2d 1272, 1273-74 (Ala. 1979), overruled by Beck v. State, 396 So.2d 645 (Ala. 1980) and Cookv. State, 369 So.2d 1260, 1261-62 (Ala.Cr.App. 1979) withJefferson v. State, 473 So.2d 1100, 1102-03 (Ala.Cr.App. 1984), affirmed, Ex parte Jefferson, 473 So.2d 1110 (Ala. 1985), cert. denied, Jefferson v. Alabama, 479 U.S. 922, 107 S.Ct. 328,93 L.Ed.2d 300 (1986). Had this been called to his attention, the trial judge could have corrected the form of the verdict.Underwood v. State, 248 Ala. 308, 311, 27 So.2d 492, 494
(1946). Having failed to object at trial, Moss cannot be allowed to claim this as error on appeal. Objections to the form, regularity, and sufficiency of the verdict cannot be raised for the first time on appeal. Morrison v. State,151 Ala. 118, 44 So. 43, 44 (1907); Baldwin v. State, 27 Ala. App. 259,260, 170 So. 349, 350, cert. denied, 233 Ala. 138,170 So. 350 (1936); Morrisette v. State, 16 Ala. App. 32, 33,75 So. 177, 178, cert. denied, Ex parte Morrisette, 200 Ala. 488,76 So. 430 (1917). "It is axiomatic that a trial court will not be put in error where no objection has been made and it has not had an opportunity to rule on the alleged error. Jury verdicts are no exception to this rule." King v. *Page 136 Adams, 349 So.2d 611, 615 (Ala.Civ.App. 1977) (citations omitted). As our Supreme Court stated in Ex parte Bracewell,447 So.2d 827, 829 (Ala.), cert. denied, Bracewell v. Alabama,469 U.S. 980, 105 S.Ct. 382, 83 L.Ed.2d 318 (1984), "[w]e will not notice any plain error in the proceeding as we would have done if the death penalty had been imposed."
Furthermore, a defendant is not entitled to a separate verdict as to each count of the indictment. McDonald v. State,241 Ala. 172, 174, 1 So.2d 658, 659 (1941).
 "It was said in The State v. Givens, 5 Ala. 747, that the jury should be instructed, at the request of the defendant, to express by their verdict on which count they render their verdict of guilty. The rule there declared is erroneous, when applied to cases like the present, where the several counts in the indictment are intended to vary the description of the same offense. It must be modified, so as to be limited to those cases only where the doctrine of election applies, or where the various counts of the indictment are intended to describe offenses which are separate and district." Jackson v. State, 74 Ala. 26, 31 (1883).
Finally, under the facts of this case, we see no inconsistency in the fact that the jury found Moss guilty of burglary/murder but did not find him guilty of rape/murder. Such findings are not mutually exclusive. The general rule is that consistency between the verdicts on the separate counts of a multicount indictment is not required. Conway v. State,489 So.2d 641, 642 (Ala.Cr.App. 1986).
We have addressed the issues Moss has raised on appeal. Our review convinces us that he received a fair trial and that the judgment of conviction is due to be and is hereby affirmed.
AFFIRMED.
All Judges concur.