The appellant, Bobby L. Glass, was convicted of rape in the first degree, burglary in the first degree, and assault in the first degree. He was sentenced as a habitual offender to life in prison without parole for both the rape and the burglary convictions, and to 15 years in prison for the assault conviction. The trial court ordered that the appellant's sentences were to run concurrently. The appellant raises several issues on appeal.
The state's evidence tended to show the following. The victim and the appellant met in October 1990 and dated for a short time before the appellant and his six-year-old daughter moved into the victim's residence, a house trailer in Alabaster, in Shelby County, in December 1990. The victim testified that she had purchased the house trailer in 1988 and that she had lived there for over two years before she met the appellant. The victim and the appellant were married in April 1991; following the marriage, they continued to live in the victim's house trailer with the appellant's daughter. The victim testified that problems soon developed in the marriage, because of the appellant's alcohol and drug abuse. In July 1991, the appellant moved out of the victim's trailer and did not return for several months; during his absence, his daughter continued to live with the victim.
The victim testified that in March 1992, the appellant expressed a desire to move back in with her. She was reluctant to allow him to do so, however, and she told the appellant that if he drank anymore or used drugs after moving back in, he would have to leave and it would be the end of their relationship. The appellant returned to live in the victim's house trailer. The victim testified that in October 1992, she found some dirty hypodermic needles in the trailer, and that this discovery confirmed her suspicions, which she said had been mounting for some time, that the appellant was still using drugs. She then confronted the appellant and told him to leave, and the appellant again moved out of the trailer. The appellant's daughter continued to live with the victim. The victim testified that after the appellant moved out, he began to show up at the trailer every night, harassing her, threatening to beat her, and accusing her of seeing other men.
The victim and the appellant "signed divorce papers in open court" on December 17, 1992. Shortly after Christmas of that year, the victim took the appellant's daughter to live with the appellant's mother so the appellant would not use his daughter as a reason to continue coming to the victim's house trailer. The divorce was finalized in January 1993.
The appellant began making telephone calls to the victim in March 1993. During these calls, he would apologize to the victim for his past behavior. The victim testified that she would tell the appellant not to call her because she was afraid of him. On April 9, 1993, the appellant telephoned the victim and told her that he wanted to come by her trailer to pick up his truck, which had remained parked at the victim's trailer after the parties' divorce although the appellant's other belongings had been removed from inside the trailer. The victim agreed to allow the appellant to come by to pick up the truck; however, she told him to come by when she would not be home because she did not want to see him. The victim testified that she deliberately stayed away from her trailer on April 9 during the time she believed the appellant would be picking up his truck. However, when she returned to her residence that afternoon, the appellant's truck was still there. Shortly thereafter, a car pulled up to the trailer and the appellant got out. The victim testified that the appellant inspected his truck and became angry; he claimed that some of his things were missing. He told the victim that he should "whip her . . . ass," and accused her of causing him to lose his child and "to lose everything." (R. 58.) The victim testified that the appellant then went into her house trailer, despite her protestations that he was not supposed to be there and her demands that he get out. The appellant accused the victim of being involved with another man and began opening her closets and dresser drawers in an apparent effort to find items of male clothing. According to the victim, the appellant continued to "rant and rave" for some *Page 117 
time, after which he told the victim that "he needed some," which she interpreted as meaning that he wanted to have sexual intercourse. (R. 59.) When the victim refused, the appellant grabbed her, tore her clothing, and told her that "he was going to have some and [she] could make it easy or [she] could make it hard." (R. 60.) The victim testified that she pleaded with the appellant to stop. However, she said, he pushed her across her bed, pulled off her pants, and engaged in sexual intercourse with her. The victim testified that she begged the appellant to stop throughout the attack and that she put up as much physical resistance as she could in light of her fear that he would hit her if she resisted further. When the appellant was done, the victim pleaded with him to leave; however, he refused, telling her that his truck would not start. The appellant remained in the victim's trailer through the night.
The following morning, April 10, 1993, the victim called a wrecker service to tow the appellant's truck from her residence. She drove the appellant to the service station to which the truck was towed and, according to her testimony, "put him out." (R. 63.) The victim testified that she drove the appellant to the service station because she was willing to do anything "to get him out of [her trailer]." (R. 63.) The night of April 10, the victim went out on a date; she returned to her trailer at around 3:30 a.m. the morning of April 11. When she entered her trailer, the appellant was inside. The victim testified that the appellant was holding a steak knife and a screwdriver and that he began demanding to know how her date was. The appellant told the victim that he was going to kill her because he had warned her not to go out with another man. He began cursing and hitting her and knocked her across her bed. The victim testified that the appellant then told her that since she wanted to have sex so badly, he was going "to help [her] out." (R. 66.) She stated that the appellant began tearing her clothes off as he continued to hit her. He dragged her off the bed by her pubic hair, and she fell to the floor. He then grabbed her by the hair on her head and by her ears and began beating her head against the floor as he slapped and hit her. At the same time, the appellant threatened to stick her with the screwdriver that he was holding. He began to hit the victim across the chest with the blunt end of the screwdriver, telling her that he was trying to decide "where it would be best to stick [her]." (R. 68.)
The victim testified that this beating lasted until daylight. She testified that after the beating, her head hurt so badly, she thought she was having a brain hemorrhage. She could not see out of her left eye, her mouth was badly swollen, and she was in so much pain that she could not move. What was left of her hair, she said, was in a row around the back of her head. The victim stated that the appellant began to apologize for his actions, telling her that she would never have been dating anyone else if he had not gotten mixed up with cocaine. The appellant then took off his clothes and lay down on the bed next to the victim. When the victim protested, the appellant told her that he was only going to lie down because he was tired. After a while, however, the appellant told the victim that he wanted to have sexual intercourse with her. The victim testified that she pleaded with the appellant not to touch her and that she told him that she thought her brain was bleeding from the beating. The appellant told the victim that she was "his" and that he could do with her what he pleased. (R. 70.) The victim again pleaded with the appellant not to do anything to her; however, he began to perform oral sex on her and then proceeded to have sexual intercourse with her. The victim testified that she was in fear for her life during the intercourse because the steak knife and the screwdriver were next to the bed, within the appellant's reach.
When the appellant left, the victim telephoned her family, and she was taken to the hospital emergency room. The victim was beaten so badly that she could not walk without assistance from others. She had bruises on her throat, legs, thighs, arms, and chest, and there were scratches on her legs. X-rays were taken of the victim's face, head, and knees at the hospital. The swelling on her face was so severe that she was required to return to the hospital for a CAT-scan to determine if there was an orbital fracture to *Page 118 
the side of her face. In court, the victim identified photographs taken of her shortly after the beating, and these photographs were given to the jury. A rape examination was performed on the victim by hospital personnel, and a "rape kit" was collected and later sent to the department of forensic sciences.
A forensic serologist testified that a semen sample removed from a vaginal swab from the rape kit was type O and that the appellant's blood was type O as well. The serologist stated that semen stains were found in the victim's panties. The victim testified that she was seeing a specialist as a result of the injuries she sustained from the beating and that over a year after the attack, she continued to suffer from severe sinus headaches. She stated that she also suffered a deviated septum and had developed other sinus problems and that her injuries caused her to experience pain when chewing. She said that whenever she chewed, her jaws would pop so badly that they ached below her ears. The victim testified that her treating physician had informed her that she would suffer from these conditions for the rest of her life.
 I.
The appellant challenges the sufficiency of the evidence to support each of his convictions.
Before addressing the appellant's claims in this regard, we would note that when considering issues dealing with sufficiency, this court must accept as true the evidence introduced by the prosecution, must accord the prosecution all legitimate inferences from that evidence, and must consider that evidence in the light most favorable to the prosecution.Smith v. State, 601 So.2d 201, 203 (Ala.Cr.App. 1992); Morgan v.State, 589 So.2d 1315, 1317 (Ala.Cr.App. 1991); Jackson v.State, 516 So.2d 726, 752 (Ala.Cr.App. 1985).
 A. The Rape Conviction
The appellant claims that there was insufficient evidence to convict him of rape in the first degree. Specifically, he argues that the state did not prove "forcible compulsion," which is a necessary element of the offense. § 13A-6-61(a)(1), Ala. Code 1975. "Forcible compulsion" is defined as "[p]hysical force that overcomes earnest resistance or a threat, express or implied, that places a person in fear of immediate death or serious physical injury to himself or another person." §13A-6-60(8), Ala. Code 1975.
The victim testified that the appellant used physical force to overcome her unwillingness to have sex with him.[1] With respect to the events of April 9, 1993, the victim testified that she told the appellant that she would not engage in sexual intercourse with him after the appellant indicated his desire for sexual intercourse. She stated that the appellant then grabbed her, tore her clothing, pushed her across her bed, and pulled her pants off. The victim testified that she begged the appellant not to continue but that he forced himself upon her and engaged in sexual intercourse. She stated that she put up as much physical resistance as she could in light of her fear that the appellant would hit her if she resisted further.
Furthermore, the victim testified that the onset of this attack was accompanied by a verbal threat from the appellant to harm her if she resisted. A victim's fear that she could be beaten if she refused to have intercourse satisfies the forcible compulsion element of first-degree rape. See Parks v.State, 565 So.2d 1265 (Ala.Cr.App. 1990). The element of forcible compulsion may be found in cases where even an implied threat serves to motivate the victim to engage in sexual intercourse. Smith, supra, 601 So.2d at 204; Parks, 565 So.2d at 1269; Flanagan v. State, 533 So.2d 637, 641
(Ala.Cr.App. 1987), rev'd on other grounds, 577 So.2d 559
(Ala.Cr.App. 1991). Accordingly, there was evidence that the victim's resistance was *Page 119 
overcome by both physical force and by a threat of injury.
With respect to the events of April 11, 1993, the victim testified that the appellant had nonconsensual sexual intercourse with her after he had severely beaten her. The victim testified that she pleaded with the appellant not to continue when he indicated that he intended to have sexual relations with her after she had been severely beaten to the point of being virtually incapacitated on the morning of April 11; however, she said, the appellant began to perform oral sex on her and then proceeded to have sexual intercourse with her. This testimony alone is sufficient to establish that the appellant used physical force to overcome the victim's resistance. Furthermore, the victim could reasonably have feared for her life, because her testimony indicated that throughout this sexual assault, a steak knife and a screwdriver, which the appellant had already used to threaten her and to strike her in the chest during the assault, were within the appellant's reach.
Through the victim's testimony, then, the state presented evidence sufficient to establish the element of forcible compulsion.
 B. The Burglary Conviction
The appellant claims that there was insufficient evidence to convict him of burglary in the first degree because, he says, the state did not prove that he "knowingly and unlawfully enter[ed] or remain[ed] unlawfully" in the victim's trailer, as required by § 13A-7-5, Ala. Code 1975. In this regard, he argues that there was no evidence that he did not have a possessory interest in the trailer or that he was not licensed or privileged to enter the trailer. He contends that the evidence showed that the victim, in fact, gave her "tacit consent" to his presence. Appellant's brief at 8.
Notwithstanding the appellant's contentions, the victim testified that she had purchased the trailer in 1988, that she had lived in the trailer for more than two years before she first met the appellant, and that she alone continued to live in the trailer following the parties' divorce in January 1993. There is nothing in the record to suggest that the appellant had any possessory or financial interest in the trailer. It is clear from the victim's testimony, moreover, that the victim had revoked any license or privilege that the appellant might have had to enter her trailer. The victim ordered the appellant to move out of the trailer in March 1992 after finding evidence of his continuing drug use, and thereafter informed the appellant that she did not want anything to do with him. The victim testified that the appellant entered her trailer without her permission on April 9, 1993, and that she demanded that he leave. She indicated that the morning after the April 9 incident, she drove the appellant to a service station in an effort to get him out of her home. The evidence showed that appellant's reentry into the trailer in the victim's absence, sometime during the evening of April 10 or the early morning of April 11, 1993, before the incident of April 11, was without the victim's permission; certainly the appellant cannot argue that he somehow had the victim's "tacit consent" to return to the trailer after the April 9 incident and after the victim's statements and actions that clearly evidenced to the appellant her unwillingness to have him present.
Furthermore, assuming arguendo that the appellant was, by some stretch of the imagination, legitimately on the premises when the victim returned to her trailer on the morning of April 11, he could still be guilty of burglary when he "unlawfully remained" on the premises after brutally beating the victim that morning, at which point any privilege he might have had to remain was terminated. Minshew v. State, 542 So.2d 307
(Ala.Cr.App. 1988); Johnson v. State, 473 So.2d 607
(Ala.Cr.App. 1985).
 "This Court adheres to the interpretation of the phrase 'unlawfully remains' found in Moss v. State, 536 So.2d 129, 133-34 (Ala.Cr.App. 1988); Minshew v. State, 542 So.2d 307, 311-12 (Ala.Cr.App. 1988); and Johnson v. State, 473 So.2d 607, 609-10
(Ala.Cr.App. 1985), that the fact that the victim terminated the defendant's license or privilege to remain on the premise can be inferred where a struggle took place and the victim was beaten." *Page 120 
Gentry v. State, 595 So.2d 548, 551 (Ala.Cr.App. 1991). Seealso, Weaver v. State, 564 So.2d 1007, 1010 (Ala.Cr.App. 1989). "Clearly, the defendant 'remained unlawfully' in the dwelling from the point at which he decided to commit a felony."Johnson, 473 So.2d at 609. The appellant was guilty of burglary by remaining in the trailer after he obviously had "reason to know that [the victim] was no longer willing that [he] . . . remain." Id. (quoting Restatement of Torts (Second) § 168 at 315 (1965).
The state's evidence was sufficient to establish that the appellant "knowingly and unlawfully entered or remained unlawfully" in the victim's trailer.
 C. The Assault Conviction
The appellant claims that there was insufficient evidence to convict him of assault in the first degree because, he says, the state failed to show that the victim sustained a "serious physical injury," a necessary element of assault in the first degree. See § 13A-6-20(a)(1), Ala. Code 1975. "Serious physical injury" is defined as a "[p]hysical injury which creates a substantial risk of death, or which causes serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ." § 13A-1-2(9), Ala. Code 1975.
In the present case, in addition to testifying to various other injuries and describing her intense pain in the aftermath of the appellant's attack, the victim testified that, more than a year after the attack, she continued to suffer from severe sinus headaches caused by the beating administered by the appellant. During the attack, the appellant repeatedly beat the victim's head against the floor while holding her by the ears and hair. The victim testified that she suffered a deviated septum in the attack and that as a result of her injuries, she had developed additional sinus problems. She further testified that her injuries caused her to experience pain whenever she chewed and that her jaws would pop so badly when she chewed, they would ache. She stated that she had been informed by her treating physician that she would continue to suffer from these conditions for the remainder of her life. There was certainly sufficient evidence presented that the victim suffered a "protracted impairment of health" as a result of the injuries sustained in the assault.
 II.
The appellant contends that the trial court erred in applying the Habitual Felony Offender Act to enhance his sentence because, he says, the state failed to show that he had been represented by counsel during his prior felony convictions. This argument is procedurally barred, however, because at sentencing, the appellant objected to the use of his prior felony convictions for enhancement on the grounds (1) that the records of these convictions had not been certified and (2) that the records constituted inadmissible hearsay. The appellant did not specify below the ground he now asserts on appeal. "The statement of specific grounds of objection waives all grounds not specified, and the trial court will not be put in error on grounds not assigned at trial." Ex parte Frith,526 So.2d 880, 882 (Ala. 1987). The issue was not preserved for appellate review. See Gray v. State, 597 So.2d 238, 239
(Ala.Cr.App. 1992), after remand, 658 So.2d 507
(Ala.Cr.App. 1992), rev'd on other grounds, 658 So.2d 509
(Ala. 1993) (appellant who objected at trial to lack of certification of prior convictions used for sentence enhancement was precluded from claiming on appeal that he was not represented by counsel during his prior felony convictions).
 III.
The appellant contends that he was denied the effective assistance of counsel at trial. This issue was not presented in any fashion to the trial court and is therefore procedurally barred for purposes of our review. Claims of ineffective assistance of counsel cannot be considered for the first time on appeal. Ex parte Jackson, 598 So.2d 895 (Ala. 1992).
For the reasons stated above, the judgment of the trial court is affirmed.
AFFIRMED.
All Judges concur.
[1] The indictment alleges that the appellant raped the victim on or about April 11, 1993. The evidence presented at trial indicated that sexual intercourse between the parties occurred on April 9, 1993, and again on April 11, 1993. Although only one count of rape is alleged in the indictment, the parties, in addressing the issue of the sufficiency of the evidence of rape, make arguments with respect to the events of both April 9 and April 11. *Page 121