COBB, Judge
(dissenting).
I respectfully dissent.
The evidence offered at trial revealed a pattern of years of sexual abuse in J.A.P. and L.P.’s home. Approximately five years before the incident in question, J.A.P.’s older brother, C.P., at the babysitter’s invitation, had been watching the babysitter and her boyfriend have sex, and the threesome subsequently invited J.A.P. to watch. Shortly thereafter, the older brother began to sexually abuse J.A.P. and the victim in this case, their younger half sister, L.P. J.A.P., in time, also had sexual contact with his half sister, giving rise to the charge in this case. There was evidence that a neighborhood *270 boy and an uncle had also sexually abused L.P. Around February 1, 2000, the mother was alerted to a problem with L.P. because of LJP.’s reaction to an adult movie that was playing on the television when L.P. unexpectedly walked into her mother’s bedroom. Four days later, the mother questioned her daughter, and thus began the unraveling of this account of in-trafamilial sexual abuse.[7] The sexual conduct between J.A.P. and L.P. in this case consisted of watching adult movies together, fondling, rubbing, and simulating sexual intercourse. There was no evidence of penetration, no evidence of any physical injury to L.P., and no evidence of oral sex involving J.A.P.[8]
I believe that this conduct does not rise to the level of the conduct proscribed by § 13A-6-61, Ala.Code 1975.
In this case, the circuit court found evidence of forcible compulsion in the courtroom testimony of the victim and in the victim’s recorded statement taken during an interview at a shelter for victims of sexual abuse.[9] The victim’s interview yielded the following relevant exchanges with the interviewer:
“L.P.: [My brothers] um, they like ... you know what parents do?
“Interviewer: Gosh, parents do lots of things. Like what, what kind of things do parents do?
“L.P.: My brother actually, you know, them movies. The movies that parents watch.
“Interviewer: The movies that parents watch. What’s in the movies, do you know?
“L.P.: My brothers told me this. Um, um, um, it, um, it is bad movies. “Interviewer: Bad movies.
“L.P.: My brothers told me to come in and watch them and I said no. And they told me anyways to come in there and watch ‘em.
[[Image here]]
“Interviewer: ... [N]ow where would you be when [J.A.P.] or [C.P.] ...
“L.P.: My home.
“Interviewer: At your home? Who all would be there?
“L.P.: Nobody.
[[Image here]]
“Interviewer: Did [C.P.] say anything while he was doing that, or while he was putting his thing on you?
“L.P.: He told me not to tell anybody, but I told somebody. I told my mom, and you, and Polly, and the other. I went to [the] police station and I went to the doctor.
[[Image here]]
“Interviewer: Yes, you did. Um, did [J.A.P.] say anything to you?
“L.P.: Uh-uh (negative).
“Interviewer: No?
“L.P.: He said the same thing.
“Interviewer: He said the same thing as what?
“L.P.: [C.P.J
*271 “Interviewer: As [C.P.] [C.P.] said not to tell, did they say what would happen if you told?
“L.P. Uh-uh (negative).
[[Image here]]
“Interviewer: Okay. Well what would it feel like when um [J.A.P.] or [C.P.] would pull their thing out and get on top of you and do like that (making waving motion on thigh of interviewer)?
“L.P.: What?
“Interviewer: Did it feel weird or funny or ...
“L.P.: Weird.
“Interviewer: Weird. Did it feel bad or did it feel good?
“L.P.: It felt good.
[[Image here]]
“Interviewer: Let me go cheek on a few things and see how Ms. Polly [the police officer] is doing downstairs.
“L.P.: Don’t tell her.
“Interviewer: Don’t tell her what?
“L.P.: That it felt good (giggle).
“Interviewer: Don’t tell her it felt good? Do you want me to fix this leg (on the doll)? Sometimes the legs come off. Okay, I will not tell her that.
“L.P.: Because I do not like to get in trouble. I don’t like trouble. This is a (unintelligible).
“Interviewer: Well, you know what you did the right thing by telling about what [C.P.] and [J.A.P.] were doing. Do you know that?
“L.P.: I was afraid I was going to get in trouble.
[[Image here]]
“Interviewer: I did not go tell Polly anything and I am not going to tell Polly anything. I mean you can talk to her about things that you want to talk to her about, but ...
“L.P.: We have ... we are going to have to go back to Polly’s in a little bit.
“Interviewer: Are you? No, I was just talking to some folks down the hall. But I’m going to tell Polly what happens next. I’m not gonna ...
“L.P.: Cause.
“Interviewer: Cause why?
“L.P.: Because I do not want people to know if it felt good or not.
“Interviewer: That’s ... you can ... you cannot tell people that. You don’t have to tell people about that.”
(Emphasis added.) At the hearing, L.P. testified about the Leeds incident with J.A.P.:
“[Defense counsel]: All right. And was there anybody else in the shop — meaning the shop of the apartment — other than you and [J.A.P.]?
“[L.P.]: No, sir.
“[Defense counsel]: And had you watched a movie this time?
“[L.P.]: Yes, sir.
“[Defense counsel]: All right. Now—
“THE COURT: Did you watch the movie too?
“[L.P.]: Yes, ma’am.
“THE COURT: Did they make you watch it or did you want to watch it?
“[L.P.]: Made me.
“THE COURT: How did they make you? How did he make you?
“[L.P.]: Just by saying come on. Just by saying come on.
“THE COURT: Okay.
“THE COURT: When you watched these movies with your brothers or either one of your brothers, did you kind of know what might happen?
“[L.P.]: Yes, ma’am. I knew all along. I knew all along.
“THE COURT: Did you ever cry or anything?
*272 “[L.P.]: No, ma’am.
“THE COURT: Did you think anything was wrong with it?
“[L.P.]: Yes, ma’am.
“THE COURT: Okay.
[[Image here]]
“[Defense counsel]: After [J.A.P.] touched you, did he say anything?
“[L.P.]: Yes, sir. He said don’t tell mom.
“[Defense counsel]: And did you say anything?
“[L.P.]: No, sir.
“[Defense counsel]: This time in Leeds before watching the movie, did [J.A.P.] say anything to you before the movie started?
“[L.P.]: Yes, sir. He said don’t tell.
“[Defense counsel]: Did he say anything else to you during that whole time?
“[L.P.]: That was it.
[[Image here]]
“[Defense counsel]: ... Okay. All right. Had [J.A.P.] — was [J.AP.] ever mean to you after you watched that movie and he touched you?
“[L.P.]: He—
“[Defense counsel]: Did he ever do anything mean or bad to you?
“[L.P.]: No, sir.
“[Defense counsel]: All right. Were you afraid of[J.AP.]?
“[L.P.]: Pm always afraid.
“[Defense counsel]: Were you afraid of [C.P.]?
“[L.P.]: Yes, sir.
[[Image here]]
“THE COURT: Are you pretty scared of all guys?
“[L.P.]: Yes, ma’am.
“THE COURT: I don’t blame you. That makes sense to me.
“[L.P.]: Yes, it does.
[[Image here]]
“[Defense counsel]: All right. But people that want to touch you, you’re afraid of them aren’t you?
“[L.P.]: Yes, sir.”
(R. 88-93.) (Emphasis added.)
Three days after L.P. told her mother about the sexual conduct, the police interviewed J.A.P.[10] When asked about the Leeds incident, J.A.P. stated in his interview that he had asked L.P. to remove her pants and panties and that he did not remember what she said when he asked her to do so. (C.R. ’94.) At the hearing, J.A.P. testified to the following:
“[Prosecutor]: Okay. Did [L.P.] take her clothes off voluntarily or did you take them off?
“[J.A.P.]: She took them off.
“[Prosecutor]: Do you recall telling Detective Collier that you took them off? [11]
“[J.A.P.]: No, sir. I don’t recall telling him that.
“[Prosecutor]: Let me ask you this. Did you ask [L.P.] to take her clothes off?
“[J.A.P.]: Yes, sir.
“[Prosecutor]: And did she take them off on her own?
“[J.A.P.]: She took them off.
“[Prosecutor]: But you asked her, you initiated her taking her clothes off?
“[J.A.P.]: No. She took her clothes off. I just asked her.
“[Prosecutor]: That’s what I’m asking. You did ask her to. She didn’t take *273 them off on her own. It wasn’t her idea to have this sexual contact with you, was it?
“[J.A.P.]: No, sir.
“[Prosecutor]: It was always your idea? “[J.A.P.]: Yes, sir.
“[Prosecutor]: You always started it? “[J.A.P.]: Yes, sir.
[[Image here]]
“[Defense counsel]: What was the reason you didn’t put your penis in her vagina, as far as you know is there any reason you could not have physically?
“[J.A.P.]: No, sir.
“[Defense counsel]: What was the reason you didn’t put your penis inside her vagina?
“[L.A.P.]: A tear fell from her eye and that kind of gave me a signal, you know.
“[Defense counsel]: Did you decide not to do it?
“[J.A.P.]: Yes, sir.
“[Defense counsel]: Now, before you ever touched her, did you order or tell her or command her to do anything?
“[J.A.P.]: No, sir.
“[Defense counsel]: Did you ever threaten her or tell her you were going to hit her or slap her?
“[J.A.P.]: No, sir.
“[Defense counsel]: Be mean to her in any way?
“[J.A.P.]: No, sir.”
(R. 198-203) (Emphasis added.)
“[W]hen considering issues dealing with sufficiency, this court must accept as true to the evidence introduced by the prosecution, must accord the prosecution all legitimate inferences from that evidence, and must consider that evidence in the light most favorable to the prosecution.” Glass v. State, 671 So.2d 114, 118 (Ala.Crim.App.1995).
Section 13A-6-61(a), Ala.Code 1975, provides:
“(a) A male commits the crime of rape in the first degree if:
“(1) He engages in sexual intercourse with a female by forcible compulsion; or
“(2) He engages in sexual intercourse with a female who is incapable of consent by reason of being physically helpless or mentally incapacitated; or
“(3) He, being 16 years or older, engages in sexual intercourse with a female who is less than 12 years old.”
(Ehaphasis added.) Section 13A-6-60(8), Ala.Code 1975, defines “forcible compulsion” as “[pjhysical force that overcomes earnest resistance or a threat, express or implied, that places a person in fear of immediate death or serious physical injury to himself or another person.” (Emphasis added.) Section 13A-l-2(9), Ala. Code 1975, defines “serious physical injury” as “[p]hysical injury which creates a substantial risk of death, or which causes serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ.”
In construing the applicability of a statute, we apply the standards established by prior caselaw:
“ ‘It is well settled that, although there are occasions when a court must correct or ignore obvious inadvertences in order to give a law the effect which was plainly intended by the legislature, the judiciary cannot and should not, in a republican form of government, usurp the legislative function. Hamilton v. Smith, 264 Ala. 199, 86 So.2d 283 (1956). Where, as here, this Court is called upon to construe a statute, the fundamental rule is that the court has a duty to ascertain and effectuate legislative in *274 tent expressed in the statute, which may be gleaned from the language used, the reason and necessity for the act, and the purpose sought to be obtained. Shelton v. Wright, 439 So.2d 55 (Ala.1983). Where a statutory pronouncement is distinct and unequivocal, there remains no room for judicial construction and the clearly expressed intent of the legislature must be given effect. Dumas Brothers Manufacturing Co. v. Southern Guaranty Ins. Co., 431 So.2d 534 (1983).’
“Ex parte Holladay, 466 So.2d 956, 960 (Ala.1985) (emphasis added).
“ ‘A basic rule of review in criminal cases is that criminal statutes are to be strictly construed in favor of those persons sought to be subjected to their operation, ie., defendants. Schenher v. State, 38 Ala.App. 573, 90 So.2d 234, cert. denied, 265 Ala. 700, 90 So.2d 238 (1956).
“ ‘Penal statutes are to reach no further in meaning than their words. Fuller v. State, 257 Ala. 502, 60 So.2d 202 (1952).
“ ‘One who commits an act which does not come within the words of a criminal statute, according to the general and popular understanding of those words, when they are not used technically, is not to be punished thereunder, merely because the act may contravene the policy of the statute. Fuller v. State, supra, citing Young’s Case, 58 Ala. 358 (1877).
“ ‘No person is to be made subject to penal statutes by implication and all doubts concerning their interpretation are to predominate in favor of the accused. Fuller v. State, supra.’
“Clements v. State, 370 So.2d 723, 725 (Ala.1979) (emphasis added), overruled on other grounds, Beck v. State, 396 So.2d 645 (Ala.1980). ‘Further, it is well established that criminal statutes should not be “extended by construction.” Locklear v. State, 50 Ala.App. 679, 282 So.2d 116 (1973).’ Ex parte Evers, 434 So.2d 813, 817 (Ala.1983).”
Ex parte Mutrie, 658 So.2d 347, 349 (Ala.1993).
Through caselaw, this Court has expanded the meaning of “forcible compulsion” in sexual offenses involving child victims to encompass situations that would not constitute “forcible compulsion” if the victim were an adult. A review of those cases proves useful to the analysis of the facts surrounding this case.
In Pittman v. State, 460 So.2d 232, 234 (Ala.Crim.App.1984), the victim testified that, when her adoptive stepfather tried to enter her room, she tried to hold the door closed, but “lost all [her] strength,” and yelled enough to wake her brothers. Her adoptive stepfather told her brothers she was merely having a nightmare. Id. The victim then followed her adoptive stepfather into her adoptive mother’s room, even though she was “scared.” Id. at 235. After the two defendants made the victim lie on the bed, her adoptive mother told her to “roll over for her daddy.” Id. The victim said, “No,” and her adoptive mother threatened, “Either you will roll over or I will tie you down.” Id. This Court held, “The force required to consummate the crime [of first-degree rape] against a mature female is not the standard for application in a case in which the alleged victim is a child thirteen years of age.” 460 So.2d at 235. Thus, although the evidence of forcible compulsion in the form of the threat issued to the victim in Pittman might not have been sufficient had the victim been an adult, because the victim was a child, the element of forcible compulsion was fulfilled by the express threat issued to the child victim by the victim’s adoptive mother.
*275 In Parrish v. State, 494 So.2d 705, 706-07 (Ala.Crim.App.1986), the 12-year-old victim, who had gone to bed ill in her mother’s boyfriend’s mother’s house, pretended to be asleep when her mother’s boyfriend entered'the room, lay beside her on the bed, put his hand up her pants, and touched her “private parts” while holding the victim down “with his foot over my leg.” The victim testified that she was bleeding following the attack. Id. at 707. This court applied a “totality of the circumstances” approach and listed the significant facts it had considered in holding that
“[t]he force was evident from the fact that the victim was held down by the appellant, who placed his foot over her leg. Additionally, testimony concerning the physical injury suffered by the victim is an element which was properly considered by the jury in its deliberations, since the 12-year-old victim stated that she had blood in her panties after the assault.”
Id. at 711 (footnote omitted). This case broadened the inquiry into issues regarding consent and force in child-victim cases where forcible compulsion is an element of the offense to a consideration of the totality of the circumstances.
In Rider v. State, 544 So.2d 994, 994 (Ala.Crim.App.), cert. denied, 544 So.2d 997 (Ala.1989), the victim testified that her stepfather showed her adult movies, and, as they watched the movies, he “ ‘would force [her] hand on one of his private spots ... [bjetween his legs.’ (Emphasis added.)”[12] She testified that her stepfather “ ‘asked’ ” her to or “ ‘made’ ” her touch his “private part” with her mouth. Id. The victim testified that she knew “ ‘it was wrong,’ ” but that she did not tell anyone because her stepfather told her that, if she told anyone, “ ‘he would probably go to jail.’ ” Id. at 995. Considering the totality of the circumstances, the Court reversed the judgment of the trial court and rendered a judgment for the defendant, finding:
“There are two kinds of forcible compulsion. First, forcible compulsion may be that physical force which overcomes earnest resistance. Second, forcible compulsion may be a threat, either express or implied, that places a person in fear of immediate death or serious physical injury to himself or another person. Here, it is clear that there is absolutely no evidence to support this second type. The problem is whether there is any evidence to support the first type.
“There is evidence that some physical force was involved because the victim testified that the defendant ‘forced’ her hand on his ‘private spot.’ With regard to this first type of forcible compulsion, there must also be some evidence of earnest resistance, which, as we noted in Richards [v. State, 475 So.2d 893, 896 (Ala.Crim.App.1985) ], requires some ‘genuine physical effort ... [by the victim] to discourage and prevent her assailant from accomplishing his intended purpose.’ We fail to find any earnest resistance. Parrish stretched the concepts of forcible compulsion and earnest resistance to their outermost limits.”
Id. at 996. Rider, then, limited Parrish’s apparently broad holding.
In Powe v. State, 597 So.2d 721, 723 (Ala.1991), the watershed in this line of cases, the father of the 11-year-old victim instructed her to get in the bed with him *276 on her mother’s side of the bed, told her to get on top of him and physically lifted her on top of him, fondled her, and had sexual intercourse with her. The victim “stated that her father did not expressly threaten her before or during the incident, [but] she did testify that she was afraid of her father.” Id. In finding sufficient evidence of forcible compulsion in this case, the Court distinguished Pittman and Parrish on the basis that “those cases, respectively, concern evidence of physical force and evidence of an express threat.” The Court also distinguished Rider because the Court found “that the evidence in the present case, unlike the evidence in Rider, merits an analysis of whether, viewing the totality of the circumstances, a jury could properly find that an implied threat was made against the victim sufficient to satisfy the element of forcible compulsion.” 597 So.2d at 726. As this analysis was an issue of first impression, the Court turned to other jurisdictions for guidance. The Court adopted the rationale from two cases from other jurisdictions, State v. Etheridge, 319 N.C. 34, 352 S.E.2d 673 (1987), and Commonwealth v. Rhodes, 510 Pa. 537, 510 A.2d 1217 (1986). The Court recited Etheridge’s holding as “a child’s general fear of a parent can suffice as the force necessary to commit a forcible sexual assault. 352 S.E.2d at 682.” Powe, 597 So.2d at 726. The Court quoted applicable passages from Etheridge:
“ ‘Sexual activity between a parent and a minor child is not comparable to sexual activity between two adults with a history of consensual intercourse. The youth and vulnerability of children, coupled with the power inherent in a parent’s position of authority, creates a unique situation of dominance and control in which explicit threats and displays of force are not necessary to effect the abuser’s purpose.’
[[Image here]]
“ ‘The child’s knowledge of his father’s power may alone induce fear sufficient to overcome his will to resist, and the child may acquiesce rather than risk his father’s wrath. As one commentator observes, force can be understood in some contexts as the power one need not use. Estrich, Rape, 95 Yale L.J. 1087, 1115 (1986).
“ ‘In such cases the parent wields authority as another assailant might wield a weapon. The authority itself intimidates; the implicit threat to exercise it coerces.’
“319 N.C. at 48, 352 S.E.2d at 681-82.”
Powe, 597 So.2d at 726-27 (emphasis added). The Court also quoted the relevant portions of the Rhodes opinion, including the following passage:
“ ‘There is an element of forcible compulsion, or the threat of forcible compulsion that would prevent resistance by a person of reasonable resolution, inherent in the situation in which an adult who is with a child who is younger, smaller, less psychologically and emotionally mature, and less sophisticated than the adult, instructs the child to submit to the performance of sexual acts. This is especially so where the child knows and trusts the adult. In such cases, forcible compulsion ... derives from the respective capacities of the child and the adult sufficient to induce the child to submit to the wishes of the adult ... without the use of physical force or violence or the explicit threat of physical force or violence.’
“510 Pa. at 557, 510 A.2d at 1227.”
Powe, 597 So.2d at 728.
Thus, in Powe, with the reasoning of Rhodes and of Etheridge as a backdrop, the Alabama Supreme Court enlarged the *277 concept of forcible compulsion, particularly the idea that an implied threat could constitute forcible compulsion, in those situations where the victim is a child and the perpetrator is an adult with a “dominant role” in the victim’s life. The Court held that the evidence was sufficient to support the verdict for first-degree rape based on the following facts: the defendant was the victim’s natural father; the defendant was married to the victim’s mother and lived in the home with the victim and her mother; the defendant was 40 years old and the victim was 11 years old; the encounter occurred in the victim’s parents’ bedroom when no one else was at home; and the victim indicated that she was afraid of her father. Id. at 728. The Court explained its holding:
“At this point, however, we note that our holding in this case is limited to cases concerning the sexual assault of children by adults with whom the children are in a relationship of trust. The reason for the distinction between cases involving children as victims and those involving adults as victims is the great influence and control that an adult who plays a dominant role in a child’s life may exert over the child. When a defendant who plays an authoritative role in a child’s world instructs the child to submit to certain acts, an implied threat of some sort of disciplinary action accompanies the instruction. If the victim is young, inexperienced, and perhaps ignorant of the ‘wrongness’ of the conduct, the child may submit to the acts because the child assumes that the conduct is acceptable or because the child does not have the capacity to refuse. Moreover, fear of the parent resulting from love or respect may play a role as great as or greater than that played by fear of threats of serious bodily harm in coercing a child to submit to a sexual act. Note, State v. Etheridge: The General Fear Theory and Intrafamilial Sexual Assault, 66 N.C. L.Rev. 1177, 1185 (1988).
[[Image here]]
“Our holding in this case establishes a mechanism by which the unique relationship between children and the adults who exercise a position of domination and control over them may be taken into consideration in determining whether the element of forcible compulsion has been established. To hold otherwise would be to require a child to be mangled, to see a deadly weapon, or to hear the actual utterance of specifically threatening words before a jury would be authorized to discern a rational fear of violence. Making these criteria absolute would be ignoring reality. See McQueen v. State, 423 So.2d 800 (Miss.1982) (Hawkins, J., dissenting).”
Powe, 597 So.2d at 728-29 (emphasis added). See also Howell v. State, 636 So.2d 1260, 1263 (Ala.1993) (holding that, taking into consideration the totality of the circumstances, the 20-year-old stepdaughter victim continued to be subject to Howell’s parental authority, and thus the evidence was “minimally sufficient” to support jury’s finding of forcible compulsion).
In B.E. v. State, 778 So.2d 863 (Ala.Crim.App.2000), this Court, in a 3-2 decision, extended the dominant-position/implied-threat theory of forcible compulsion and broadened its application to a fact situation where an older sibling of the victim was the accused. In B.E., the victim was 5 years old at the time of the incident and the appellant, her half brother, was 14 years old. The victim testified that the appellant was babysitting her while her parents were at work and that the appellant removed her clothes and sexually assaulted her. The victim also testified that the appellant “told her not to tell anyone about the incident, and that, if she *278 did, he would not let her back into his room.’ ” 778 So.2d at 866. The majority invoked Powe, Rhodes, and Howell to bolster its holding that
“[c]onsidering the circumstances here— the abuse being committed by a significantly older and bigger male family member who was exercising sole custodial control over the victim at the time of the alleged acts — we find that the evidence was sufficient to present a question for the trier of fact as to whether the acts against A.S. were accomplished by forcible compulsion.”
778 So.2d at 866. The court found Powe to be applicable because, although the Alabama Supreme Court specifically limited its holding to those situations where an adult has been charged with raping a child victim, “the focus in Powe is on the child victim and the perspective should be that of the child victim.” Id. It would seem that B.E. drew the outermost limit of those factual situations, devoid of physical force, meaningful threats, and coercion, that would culminate in a conviction for rape.
Powe and its progeny were applicable in B.E., if at all, because the victim testified that the appellant was babysitting her when the incident occurred. Thus, when analyzing the totality of the circumstances surrounding a sex crime involving a child victim, the relevant inquiries are whether the victim perceived a dominant relationship between herself and the accused, and whether the accused’s use of that relationship to his advantage constituted an implied threat sufficient to fulfill the requisite element of forcible compulsion necessary to support a conviction for rape.
The majority maintains that sufficient evidence of forcible compulsion existed because J.A.P. was four and a half years older than L.P.; that J.A.P. and L.P. were alone at the time of the incident; and that J.A.P. instructed L.P. not to tell anyone about the incident. The majority also points out that L.P. testified that she was always afraid and that she was “made” to watch pornographic videos. However, the majority also states that its holding is based on its consideration of “the extent to which the appellant may have been in a position of domination or influence over the victim.” 853 So.2d at 269 (emphasis added). In this case, there is no evidence that J.A.P. was in a dominant or influential position over L.P.
The trial court found that the State had proven attempted rape, essentially because sexual abuse of the victim had become a “habit and pattern of her brothers and their friends.” (R. 209.) However, after reviewing the record and taking into consideration the totality of the circumstances as they concern this defendant alone, the evidence of “forcible compulsion” to support J.A.P.’s adjudication of delinquency based on the underlying charge of attempted first-degree rape was not only insufficient, but essentially nonexistent. Although J.A.P. was older than L.P., and although the two were alone during the incident, no evidence suggested that J.A.P. was fulfilling a caretaker or custodial capacity in regard to L.P. Testimony during the hearing revealed a family situation in which the children were allowed to spend their days with little or no adult supervision. Although J.A.P. told L.P. not to tell anyone, which is consistent with the expected behavior of children doing things they are not supposed to do, he did not threaten her with any consequences if she did tell. When asked if she was afraid of J.A.P., L.P. replied, “I am always afraid,” rather than stating specifically that she was afraid of J.A.P., as she did when asked if she was afraid of her older brother, C.P. *279 (R. 90.) L.P. also testified that, at the time of the hearing, she was scared of “all guys.” (R. 92.) There was no evidence that L.P. was afraid of J.A.P. at the time of the incident made the basis of the complaint or that she participated in sexual activity with J.A.P. out of fear. In fact, she admitted in the interview at the shelter, with some obvious shame, that what had happened with J.A.P. felt “good.”
The facts of this case are extremely disturbing, particularly when one considers the incident between J.A.P. and L.P. in conjunction with the other alleged incidents between L.P. and C.P., between L.P. and an uncle, between L.P. and a neighbor, and between C.P. and J.A.P. However, this case involves only the one incident between J.A.P. and L.P. alleged in the petition. As Justice Almon stated in his dissent regarding the appellant in Powe, “[T]he Court’s understandable feeling that he should be punished should not cloud its judgment and lead to a distortion of the law.” 597 So.2d at 730 (Almon, J., dissenting).
This fact situation warrants judicial intervention and some sort of therapeutic disposition. Quite simply, though, to reach the disposition phase, the trial court must have sufficient evidence before it to adjudicate a juvenile delinquent. Although these facts are disturbing, and perfectly exemplify the old adage, “Bad facts make bad law,” it is my opinion that the Legislature has yet to enact a criminal statute that would encompass this situation. By virtue of J.A.P.’s age, he is not guilty of attempted statutory rape.[13] Because there is no evidence of forcible compulsion, he is not guilty of attempted first-degree rape. See § 13A-6-61(a)(l), Ala.Code 1975.
It is completely understandable that the learned trial judge in this matter could have felt torn between a strict construction of the statute on which the petition was based and the realization that the children in this family silently cried out for the help that their parents were unwilling to provide.[14] It is undisputed that J.A.P. was himself a victim of sexual abuse by his older brother. As a child of divorced parents both of whom had full-time jobs, his *280 out-of-school time was devoid of adult supervision, with ready access to pornographic movies. Consequently, it is easy to conclude that, if criminal charges were to be brought, those charges should have been brought against the parents of J.A.P. and L.P., not against J.A.P. himself. The Legislature did not envision inappropriate consensual sexual activities of classic “latchkey children” when it enacted § 13A-6-61.
The majority’s understandable reaction that such a tragic situation should culminate in someone’s being punished should not lead it to stretch the law defining “forcible compulsion” to its breaking point in order to authorize that punishment. I believe that the trial court erroneously denied J.A.P.’s motion for a judgment of acquittal at the end of the State’s case-in-chief and J.A.P.’s motion for a new trial, based on its determination that the State had presented sufficient evidence of forcible compulsion to support an adjudication of delinquency based on attempted first-degree rape. It is because of this that I respectfully dissent.

. J.A.P. was 13 years, 10 months old, and L.P. was 9 years, 4 months old when the mother discovered that L.P. was being abused.

. Although the evidence presented in the hearing revealed numerous sexual encounters between L.P. and her half brothers at various residences of their mother and of their father, the particular incident made the basis of this petition for delinquency occurred in March 1999 in the mother’s apartment in Leeds, Alabama, which was attached to her beauty shop. This particular encounter is referred to as the "Leeds incident.”

.The tape from the interview was admitted into evidence. (R. 71.)

. The audiotape of the interview was admitted into evidence at the hearing. (R. 117.)

. Nowhere in the interview does J.A.P. admit to removing L.P.’s clothing at any time.

. Although the defendant in Rider was convicted of first-degree sexual abuse and of first-degree sodomy, rather than first-degree rape, he was convicted under those provisions of the statutes that require a showing of forcible compulsion. See §§ 13A-6-61(a)(1) and 13A-6~63(a)(l), Ala.Code 1975.

. J.A.P. was 14 years old at the time of the hearing. The statutory rape sections of the Alabama Code require that the perpetrator be 16 years old:
"A male commits the crime of rape in the first degree if ... [h]e, being 16 years or older, engages in sexual intercourse with a female who is less than 12 years old.”
§ 13A-6-61(a)(3), Ala.Code 1975.
"A male commits the crime of rape in the second degree if, [bjeing 16 years old or older, he engages in sexual intercourse with a female less than 16 and more than 12 years old; provided, however, the actor is at least two years older than the female.”
§ 13A-6-62(a)(l), Ala.Code 1975.

. As an alternative to adjudicating J.A.P. delinquent with insufficient evidence, the trial judge could have instead, ex mero motu, declared J.A.P. a multiple needs child. See § 12-15-1(19), Ala.Code 1975 (defining a multiple needs child as "a child coming to the attention of the court ... who is at imminent risk of out-of-home placement or a placement in a more restrictive environment, as a result of the conditions of emotional disturbance, behavior disorder, ... lack of supervision, [or] delinquency, or any combination thereof, and whose needs require the services of two or more of the following entities: Department of Youth Services, public school system (services for exceptional needs), Department of Human Resources, Department of Public Health, juvenile court probation services, or Department of Mental Health and Mental Retardation”); § 12-15-71(h)(1), Ala.Code 1975 {‘‘Regardless of the nature of the petition or allegation, when evidence is presented to the court that a child is a imminent risk of an out-of-home placement or a placement in a more restrictive environment as a result of the conditions [listed in § 12-15-1(19)], and if such conditions require the services of two or more agencies pursuant to Section 12-15-1(19), the juvenile court shall refer the child to the county children’s services facilitation team for assessment and recommendations unless a *280 current facilitation team plan is available to the court.'’ (Emphasis added.)).