The appellant, Adrian Roderick Davis, was convicted of the capital offense of murder committed during the course of a robbery, Ala. Code 1975, § 13A-5-40(a)(2), and the capital offense of murder committed during the course of a burglary, § 13A-5-40(a)(4). Both convictions were based on one killing. He was sentenced to two terms of life imprisonment without parole, the sentences to be served consecutively.
 I
The appellant contends that the trial court erred in denying his challenge for cause as to prospective juror C.O., who stated during voir dire examination that he was "strictly for capital punishment" (R. 511) and that he believed that death should be the punishment for someone found guilty of a capital offense. The appellant argues that these and other statements made by C.O. during voir dire indicated that C.O. had a fixed opinion that the death penalty should be automatically imposed in capital cases. See Morgan v. Illinois, 504 U.S. 719, 112 S.Ct. 2222,119 L.Ed.2d 492 (1992), and Martin v. State, 548 So.2d 488 (Ala.Cr.App. 1988), aff'd, 548 So.2d 496 (Ala.), cert. denied, 493 U.S. 970,110 S.Ct. 419, 107 L.Ed.2d 383 (1989) (potential jurors who indicated they would automatically vote for death penalty for every eligible defendant must be excluded *Page 476 
when challenged for cause). The appellant says that he was forced to expend a peremptory strike to remove C.O. from the venire because of the trial court's refusal to grant the challenge for cause; he argues that he was therefore prejudiced by the trial court's ruling. See Hunter v. State, 585 So.2d 220
(Ala.Cr.App. 1991).
While the record reflects that C.O. indeed expressed his strong support of capital punishment, the record also reflects that during voir dire, C.O. stated that his opinion regarding capital punishment would not affect his ability to be fair and impartial; he also stated that he would have to be sure "without a shadow of a doubt" (R. 562) before he could vote for the death penalty. Further, after the trial court explained to prospective jurors the nature of the two phases of a capital trial, C.O. stated that he could weigh the aggravating and mitigating circumstances during the sentencing phase; that he would follow the law and the instructions of the trial court; and thathe would not automatically vote for the death penalty for an eligible defendant. The trial court did not abuse its discretion in denying the appellant's challenge for cause as to C.O. See Taylor v. State, 666 So.2d 36 (Ala.Cr.App. 1994).
 II
The appellant contends that there was insufficient evidence to support his conviction for murder committed during the course of a burglary because, he says, there was no evidence to show that he "knowingly and unlawfully entered or remained unlawfully" in the victim's dwelling, a required element of burglary, see § 13A-7-5, Ala. Code 1975.[1]
Section 13A-7-5 provides:
 "(a) A person commits the crime of burglary in the first degree if he knowingly and unlawfully enters or remains unlawfully in a dwelling with intent to commit a crime therein, and, if, in effecting entry or while in [the] dwelling or in immediate flight therefrom, he or another participant in the crime:
"(1) Is armed with explosives or a deadly weapon; or
 "(2) Causes physical injury to any person who is not a participant in the crime; or
 "(3) Uses or threatens the immediate use of a dangerous instrument.
(Emphasis added.) The term "enters or remains unlawfully" is defined in § 13A-7-1(4), Ala. Code 1975: "A person `enters or remains unlawfully' in or upon premises when he is not licensed, invited or privileged to do so."
The appellant argues that there was no evidence that he "broke and entered" the victim's dwelling; therefore, he says, the jury was required to engage in mere speculation as to how he initially gained entry (e.g., did the appellant initially come into the dwelling with the victim's permission?), and further, he argues there was no evidence that, once there, he "remained unlawfully" on the premises.
The appellant relies on the Alabama Supreme Court's recent holding in Ex parte Gentry, 689 So.2d 916 (Ala. 1996), in which the Court addressed the following question: "if a person who has permission to be in a dwelling murders the occupant, has that person also committed burglary by virtue of `remaining unlawfully' in the dwelling, on the basis that the jury could infer from the fact that a struggle preceded the murder that the occupant must have revoked the person's permission to be there?" 689 So.2d at 917. In Gentry, the evidence tended to show that the victim had given the defendant, with whom she had been romantically involved, a key to her residence; that the defendant used the key to enter the residence while the victim was away; and that the defendant waited for her to return and then murdered her *Page 477 
inside her residence. The Alabama Supreme Court reversed Gentry's conviction for murder committed during the course of a burglary, because the jury had been instructed that it could infer from the fact that a struggle had taken place inside the victim's residence that the victim had revoked any license Gentry may have had to be on her premises. The Court stated:
 "[W]e hold that to establish an `unlawful remaining' when the defendant has a license or privilege to be on the premises, the State must present evidence other than evidence that the defendant committed a crime in a dwelling or a building owned or controlled by the victim. . . .
". . . .
 "There is no evidence of a burglary in this case. Gentry simply used the key that [the victim] had given him to enter her apartment. When she returned home, he killed her. There is no separate crime of burglary simply because one could infer that she realized he was attacking her and therefore may or must have `revoked his privilege to remain.' It was, therefore, error to instruct the jury that for purposes of determining whether the defendant had committed a burglary, `the fact that the victim had terminated the defendant's license or privilege to be present in the victim's apartment can be inferred from the circumstances that a struggle took place.' This jury instruction had the effect of relieving the State of its burden of presenting a prima facie case of burglary. The burden is on the State to offer sufficient evidence to prove each element of a charged offense. Warren v. State, 292 Ala. 71, 288 So.2d 826 (1973)."
689 So.2d at 921 (emphasis added).
In the case now before us, the evidence tended to show the following: the appellant lived in his mobile home with his girlfriend, Shairl Carwell. His mobile home was across the street from the mobile home of the victim, Artie Kate Harrington. Carwell and Harrington were friends and worked together at the same nursing home. On the morning of November 23, 1994, Carwell, while at work, telephoned Harrington's residence and asked Harrington to go to the appellant's mobile home and tell the appellant to come to the nursing home to pick up Carwell's paycheck so that he could take it to the bank to cash it. Harrington agreed to do so. Carwell testified that the appellant picked up her paycheck at the nursing home and then left the nursing home at approximately 8:50 a.m. She stated that she did not see him again until around 1:30 p.m. or 2:00 p.m. that day.
At around 8:30 a.m. that morning, Harrington left her mobile home in a taxi and went to the nursing home, where she picked up her paycheck. The taxi driver then took Harrington to the bank to cash her paycheck. After leaving the bank, the driver took Harrington to Lelia Buchanan's house to have her hair done. After Buchanan did Harrington's hair, she agreed to drive Harrington home. En route, the two stopped at the post office, where Harrington purchased a $50 money order and placed it in her purse. Buchanan then drove Harrington to her mobile home and dropped her off.
At 11:23 a.m., Harrington telephoned her landlord, Bobby Overcash, and told him that he could come by her mobile home to collect the rent. Harrington next telephoned her sister, Ruby McCants. While they were talking, Harrington told McCants that there was a knock at her door and that it must be her landlord. Harrington then told McCants that she would call her back; however, she never did.[2] At around 12:35 p.m., Linda Overcash, *Page 478 
Bobby Overcash's wife, went to Harrington's mobile home to collect Harrington' rent. When she arrived, she noticed that the front door was partially open. There were no signs of forced entry. Overcash entered the mobile home and found Harrington's dead body, lying face up on the floor in the living room. It was later determined that Harrington had died from ligature strangulation. She had been strangled with a cord of some type, possibly an electrical cord. Medical testimony indicated that she had a mark one-quarter-inch wide extending around her neck and that she had also received three nonfatal stab wounds to her lower back. Harrington's purse was found hanging at the foot of her bed, a short distance from the living room and her body. The appellant's fingerprints were found on a Citizen's National Bank envelope and a plain white envelope inside Harrington's purse. The $50 money order was not found.
In addition to the appellant's fingerprints being found on items in Harrington's purse, additional evidence was presented to link the appellant to Harrington's murder. Testimony revealed that the appellant made two trips to Bi-City Auto on the day of the murder to pay on Carwell's credit account. On the second trip, sometime between 1:30 p.m. and 2:00 p.m., the appellant presented a $50 money order to a Bi-City Auto employee and asked to pay $10 on Carwell's account. The money order was blank, and the appellant completed a portion of it with his name. The Bi-City Auto employee accepted the money order and gave the appellant $40 in change. Evidence was presented establishing that this money order was the same money order Harrington had purchased earlier that morning.
The appellant testified at trial. He denied ever having been inside Harrington's mobile home. He was unable to offer any explanation as to how his fingerprints came to be on the items found in Harrington's purse.
 "To constitute burglary it is essential to prove a breaking into and entering of the house in question. If a door or window be open and entry made through it this is not a breaking. The state is not required to prove the entrance door or window was locked. If entry is made by opening a closed door this is sufficient to show a breaking."
Martin v. State, 44 Ala. App. 395, 210 So.2d 704, 707 (1968).
Here, there was no evidence that the appellant "broke and entered" Harrington's mobile home. While there was no testimony indicating that the appellant had a relationship with Harrington and no direct evidence that he had permission to be in her mobile home on the day of the murder, neither was there evidence suggesting how the appellant had entered the dwelling. "We cannot affirm a conviction based on mere conjecture or speculation where the record is completely silent as to an essential element of the offense." Duncan v. State, 338 So.2d 446, 448 (Ala.Cr.App. 1976).
Before the Alabama Supreme Court's holding in Gentry, this court could have affirmed the appellant's conviction for murder during the course of a burglary, even if we were to concede that the appellant may initially have been licensed or privileged to be inside Harrington's residence. Before Gentry, the courts of this state had consistently held that evidence of a struggle and murder inside the victim's dwelling was sufficient to establish that any initial license to enter had been withdrawn. See, e.g., Johnson v.State, 473 So.2d 607 (Ala.Cr.App. 1985) (termination of a license or privilege to remain on the victim's premises can be inferred from the circumstances that a struggle took place and that the victim had been beaten; nonconsent need not be proved by direct evidence, *Page 479 
but may be inferred from circumstantial evidence); Mossv. State, 536 So.2d 129 (Ala.Cr.App. 1988) (circumstantial evidence is sufficient to support the inference that defendant "entered or remained unlawfully" in the victim's residence; jury was not "forced to speculate" on how the defendant gained entry into the victim's house). Before Gentry, even had the jury speculated that the appellant somehow initially had received Harrington's permission to enter her mobile home, the fact that Harrington had revoked the appellant's license or privilege to be present — and, therefore, that the appellant had "remained unlawfully" — could be inferred from the fact that a struggle had taken place, and a conviction for murder during the course of a burglary could be sustained. However, an entire line of cases, including Johnson andMoss — cases proven by circumstantial evidence similar to the evidence in this case where convictions of murder during the course of a burglary were affirmed on the basis that evidence of a struggle was sufficient to establish that any license that the defendants may have had to be in the victims' dwellings had been revoked — was overruled by the Alabama Supreme Court's holding inGentry. The Supreme Court's stated intention in Gentry was to prevent conviction for a capital murder committed during the course of a burglary based on the mere fact that the murder took place inside a dwelling. However, while the holding in Gentry may have resolved a specific problem presented by the circumstances in that case, it has created a new problem for those burglary cases where the occupant of the dwelling is murdered, there are no signs of forced entry, and there is no direct evidence as to how the defendant entered the dwelling. Gentry severely curtails the possibility of establishing the revocation of license by the victims in such cases.
We are constrained to follow Gentry in this case. See § 12-3-16, Ala. Code 1975. Therefore, we must reverse the appellant's conviction for murder committed during the course of a burglary, and we remand the cause to the trial court with directions for that court to vacate the appellant's conviction for that capital offense. However, we urge the Alabama Supreme Court to reconsider its holding in Gentry.
 III
The appellant also contends that because he was tried, convicted, and sentenced for two counts of capital murder arising out of the same incident, i.e., the killing of one person, he was improperly subjected to multiple punishments for the same offense. The appellant's convictions and sentences for both offenses did not violate the Double Jeopardy Clause. See Seritt v. State,647 So.2d 1, 3 (Ala.Cr.App. 1994); Powell v. State, 631 So.2d 289
(Ala.Cr.App. 1993). However, because we have ordered the appellant's conviction for murder during the course of a burglary to be vacated, this issue is now moot.
For the foregoing reasons, the appellant's conviction for murder committed during the course of a robbery is affirmed. However, as discussed in Part II of this opinion, the appellant's conviction for murder committed during the course of a burglary is reversed, and this cause is remanded to the Chambers County Circuit Court with directions to vacate its judgment as to that conviction.
AFFIRMED AS TO CONVICTION FOR MURDER COMMITTED DURING THE COURSE OF A ROBBERY; REVERSED AS TO CONVICTION FOR MURDER COMMITTED DURING THE COURSE OF A BURGLARY; AND REMANDED.
All Judges Concur.
[1] The appellant does not challenge the sufficiency of the evidence in support of his conviction for murder committed during the course of a robbery.
[2] Although McCants testified that this telephone conversation took place at around 11:00 a.m., it is apparent that it must have taken place after Harrington telephoned Bobby Overcash at 11:23 a.m. Overcash's caller I.D. established the time of Harrington's telephone call to him as 11:23 a.m. In light of Harrington's statement to McCants that the landlord was knocking at her door, Harrington's call to McCants must have taken place after 11:23 a.m., rather than around 11:00 a.m. *Page 480