737 So.2d 480 (1999)
Ex parte State of Alabama.
In re Adrian Roderick DAVIS
v.
STATE.
1961993.
Supreme Court of Alabama.
January 8, 1999.
Bill Pryor, atty. gen., and Cedric B. Colvin, asst. atty. gen., for petitioner.
Thomas M. Goggans, Montgomery, for respondent.
PER CURIAM.
A Chambers County jury convicted Adrian Roderick Davis of murder committed during a robbery, Ala.Code 1975, § 135-40(a)(2), and murder committed during a burglary, § 13A-5-40(a)(4), based on the 1994 death of Artie Kate Harrington. The trial court sentenced Davis to two consecutive terms of life imprisonment without parole. The Court of Criminal Appeals *481 affirmed his conviction for murder committed during the course of a robbery, but reversed his conviction for murder committed during the course of a burglary. Davis v. State, 737 So.2d 474 (Ala.Crim. App.1997). On November 14, 1997, this Court denied Davis's petition for certiorari review, without opinion (docket no. 1961981). We granted the State's petition for a writ of certiorari, to review the Court of Criminal Appeals' judgment reversing the conviction of murder committed during the course of a burglary. We reverse the judgment of the Court of Criminal Appeals insofar as it reversed that conviction, and we remand the cause.

I. Statement of Facts
The Court of Criminal Appeals found that the evidence in this case tended to show the following:
"[Davis] lived in his mobile home with his girlfriend, Shairl Carwell. His mobile home was across the street from the mobile home of the victim, Artie Kate Harrington. Carwell and Harrington were friends and worked together at the same nursing home. On the morning of November 23, 1994, Carwell, while at work, telephoned Harrington's residence and asked Harrington to go to [Davis's] mobile home and tell [Davis] to come to the nursing home to pick up Carwell's paycheck so that he could take it to the bank to cash it. Harrington agreed to do so. Carwell testified that [Davis] picked up her paycheck at the nursing home and then left the nursing home at approximately 8:50 a.m. She stated that she did not see him again until around 1:30 p.m. or 2:00 p.m. that day.
"At around 8:30 ... that morning, Harrington left her mobile home in a taxi and went to the nursing home, where she picked up her paycheck. The taxi driver then took Harrington to the bank to cash her paycheck. After leaving the bank, the driver took Harrington to Lelia Buchanan's house to have her hair done. After Buchanan did Harrington's hair, she agreed to drive Harrington home. En route, the two stopped at the post office, where Harrington purchased a $50 money order and placed it in her purse. Buchanan then drove Harrington to her mobile home and dropped her off.
"At 11:23 a.m., Harrington telephoned her landlord, Bobby Overcash, and told him that he could come by her mobile home to collect the rent. Harrington next telephoned her sister, Ruby McCants. While they were talking, Harrington told McCants that there was a knock at her door and that it must be her landlord. Harrington then told McCants that she would call her back; however, she never did. At around 12:35 p.m., Linda Overcash, Bobby Overcash's wife, went to Harrington's mobile home to collect Harrington's rent. When she arrived, she noticed that the front door was partially open. There were no signs of forced entry. Overcash entered the mobile home and found Harrington's dead body, lying face up on the floor in the living room. It was later determined that Harrington had died from ligature strangulation. She had been strangled with a cord of some type, possibly an electrical cord. Medical testimony indicated that she had a mark one-quarter-inch wide extending around her neck and that she had also received three nonfatal stab wounds to her lower back. Harrington's purse was found hanging at the foot of her bed, a short distance from the living room and her body. [Davis's] fingerprints were found on a Citizen's National Bank envelope and a plain white envelope inside Harrington's purse. The $50 money order was not found.
"In addition to [Davis's] fingerprints being found on items in Harrington's purse, additional evidence was presented to link [Davis] to Harrington's murder. Testimony revealed that [Davis] made two trips to Bi-City Auto on the day of the murder to pay on Carwell's credit *482 account. On the second trip, sometime between 1:30 p.m. and 2:00 p.m., [Davis] presented a $50 money order to a Bi-City Auto employee and asked to pay $10 on Carwell's account. The money order was blank, and [Davis] completed a portion of it with his name. The Bi-City Auto employee accepted the money order and gave [Davis] $40 in change. Evidence was presented establishing that this money order was the same money order Harrington had purchased earlier that morning.
"[Davis] testified at trial. He denied ever having been inside Harrington's mobile home. He was unable to offer any explanation as to how his fingerprints came to be on the items found in Harrington's purse."
Davis, 737 So.2d at 477-78.
Before the Court of Criminal Appeals, Davis argued that this evidence was insufficient to support his conviction for murder during a burglary, primarily because, he claimed, there was no evidence showing that he "knowingly and unlawfully enter[ed] or remain[ed] unlawfully" in Harrington's dwelling. See Ala.Code 1975, § 13A-7-5. The Court of Criminal Appeals held that the State had presented no evidence establishing these statutory elements. Not only did the evidence presented fail to show a "breaking" of the victim's home, there was no direct evidence establishing how Davis entered the home. There were no signs of forced entry indicating that Davis initially entered the home unlawfully. There was also no indication that Davis entered the home with the victim's permission but then remained unlawfully in the home. The court, concluding that this lack of evidence that Davis in some way trespassed in the victim's home was fatal to the prosecution's case, reversed Davis's burglary-murder conviction.

II. Analysis
Davis was indicted for murder committed during a burglary in the first degree, § 13A-7-5, Ala.Code 1975.[1] The relevant portion of that statute provides:
"(a) A person commits the crime of burglary in the first degree if he knowingly and unlawfully enters or remains unlawfully in a dwelling with intent to commit a crime therein, and, if, in effecting entry or while in [the] dwelling or in immediate flight therefrom, he or another participant in the crime:
"(1) Is armed with explosives or a deadly weapon; or
"(2) Causes physical injury to any person who is not a participant in the crime; or
"(3) Uses or threatens the immediate use of a dangerous instrument."
Alabama's burglary statute further provides that "[a] person `enters or remains unlawfully' in or upon premises when he is not licensed, invited or privileged to do so." Ala.Code 1975, § 13A-7-1(4). An unlawful entry or unlawful remaining constitutes the trespassory element of burglary, which element, when coupled with the intent to commit a crime inside, forms the nucleus of the burglary offense.
The common law defined the crime of burglary far more narrowly than its statutory successor does. Common-law burglary required a breaking and entering of the dwelling of another in the nighttime with the intent to commit a felony. Wayne R. LaFave and Austin W. Scott, Jr., Substantive Criminal Law § 8.13 (1986). When Alabama adopted its current burglary statute, as part of the Alabama Criminal Code, by Act No. 607, Reg. Session, Ala. Acts 1977, the legislature expanded the crime of burglary beyond its commonlaw boundaries, by eliminating most of the common-law requirements. The requirement of a "breaking" was one requirement deleted. Perry v. State, 407 So.2d 183 *483 (Ala.Crim.App.1981). The State is no longer required to prove that the defendant broke and entered the premises. Instead, the strictures of that element have been replaced with the general requirement of a trespass on premises through an unlawful entry or an unlawful remaining.
Although the Court of Criminal Appeals did not directly say that Davis's conviction could not stand because there was no proof of a "breaking and entering," the court implied that, by stating that there was no evidence of a breaking and entering and by quoting this statement from Martin v. State, 44 Ala.App. 395, 398, 210 So.2d 704, 707 (1968): "To [prove] burglary it is essential to prove a breaking into and entering of the house in question." Davis, 737 So.2d at 478. As the Court of Criminal Appeals has held repeatedly, this is not the law and has not been the law since the Alabama Criminal Code became effective. Perry, supra; Hollins v. State, 415 So.2d 1249 (Ala.Crim.App.1982); Johnson v. State, 473 So.2d 607 (Ala.Crim.App.1985), overruled, Ex parte Gentry, 689 So.2d 916 (Ala.1996).
While the State was not required to prove "breaking and entering," it was required to prove that Davis entered or remained "unlawfully" in Harrington's home with the intent to commit a crime. The "unlawful remaining" prong of Alabama's burglary statute "cover[s] cases where a person enters with license or privilege but remains after termination of such license or privilege." Ala.Code 1975, § 13A-7-1 Commentary.
The Court of Criminal Appeals expressed a reluctance to follow Ex parte Gentry, supra:
"The Supreme Court's stated intention in Gentry was to prevent conviction for a capital murder committed during the course of a burglary based on the mere fact that the murder took place inside a dwelling. However, while the holding in Gentry may have resolved a specific problem presented by the circumstances in that case, it has created a new problem for those burglary cases where the occupant of the dwelling is murdered, there are no signs of forced entry, and there is no direct evidence as to how the defendant entered the dwelling. Gentry severely curtails the possibility of establishing the revocation of license by the victims in such cases.
"We are constrained to follow Gentry in this case.... However, we urge the Alabama Supreme Court to reconsider its holding in Gentry."
Davis, 737 So.2d at 479. In Gentry, this Court overruled a line of precedents holding that evidence of a struggle and a murder inside the victim's dwelling was sufficient to establish that any initial license to enter had been withdrawn. See Glass v. State, 671 So.2d 114 (Ala.Crim.App.1995); Stewart v. State, 601 So.2d 491 (Ala.Crim. App.1992); Gentry v. State, 595 So.2d 548 (Ala.Crim.App.1991); Weaver v. State, 564 So.2d 1007 (Ala.Crim.App.1989); Minshew v. State, 542 So.2d 307 (Ala.Crim.App. 1988); Moss v. State, 536 So.2d 129 (Ala. Crim.App.1988); Johnson v. State, supra. Gentry served a valid purpose in condemning a finding of burglary merely from the commission of a crime that could not be deemed to be within the scope of the privilege to enter. To hold otherwise would have converted every privileged entry followed by a crime into a burglary, thereby running afoul of the constitutional requirement of reserving capital punishment for only the most egregious crimes. Gentry, supra, 689 So.2d at 921. However, in sweeping out mere evidence of the commission of a crime following privileged entry, this Court condemned the use of evidence of a struggle as indicium of revocation of the defendant's license or privilege to remain. In so doing, the Court swept with too broad a broom.
Evidence of a struggle that gives rise to circumstantial evidence of revocation of a license or privilege can be used to show an unlawful remaining, a separate prong of the offense of burglary upon which a conviction can be based. We are *484 certainly mindful of the doctrine of stare decisis and recognize that Gentry was decided only fairly recently; nevertheless, this Court must make a course correction if a correction is necessary. To the extent that Gentry is inconsistent with this rule, we overrule it.
We reiterate that the evidence of a commission of a crime, standing alone, is inadequate to support the finding of an unlawful remaining, but evidence of a struggle can supply the necessary evidence of an unlawful remaining. In homicide cases, the mere fact of the victim's death cannot be equated with a struggle. For example, evidence of a privileged entry followed by death from an injury inflicted by surprise or stealth and causing instantaneous death would not constitute circumstantial evidence of an unlawful remaining. Likewise, a privileged entry followed by death from an injury inflicted by a delayed mechanism, such as poison, would be equally deficient.
The evidence was sufficient for the jury to find that Davis killed Harrington during a burglary. The evidence of a struggle giving rise to the inference of an unlawful remaining is supplied by Davis's choice to kill by a less-than-instantaneous technique of strangulation and by his use of three nonfatal stab wounds to the victim's lower back. Based on the circumstances suggested by the evidence, the jury reasonably could have found that Davis, from the point at which he began committing his criminal acts, "remain[ed] unlawfully" in Harrington's home with the intent to commit a crime.
That portion of the judgment of the Court of Criminal Appeals reversing Davis's conviction of murder committed during the course of a burglary is reversed. The cause is remanded for an order or proceedings consistent with this opinion.
REVERSED AND REMANDED.
HOOPER, C.J., and HOUSTON, SEE, and LYONS, JJ., concur.
MADDOX, J., concurs specially.
ALMON,[*] SHORES,[*] KENNEDY, and COOK,[*] JJ., dissent.
MADDOX, Justice (concurring specially).
I write specially to state that I am pleased that this Court has now elected to overrule Ex parte Gentry, 689 So.2d 916 (Ala.1996), insofar as that Gentry opinion is inconsistent with the rule announced in this case. As the main opinion points out, the Court of Criminal Appeals has "expressed a reluctance to follow [Gentry]." 737 So.2d at 483. I believe this Court has now given effect to the intent of the Legislature in adopting § 13A-7-5, Ala.Code 1975, which modified the common-law definition of burglary.
I dissented in Gentry, 689 So.2d at 922, because I believed, based on the facts of that case, that the jury could have found that the defendant Gentry, although he had had a license to be on the premises, had "unlawfully remained" there, within the meaning of the burglary statute. For a better understanding of the reasons for my dissent in Gentry, and the reason why I concur to overrule Gentry, see my dissenting opinion in that case.
ALMON, Justice (dissenting).
I disagree with the majority's decision to overrule Ex parte Gentry, 689 So.2d 916 (Ala.1996) ("Gentry III"). Gentry III is soundly based on statutory construction, this Court's traditional burglary jurisprudence, and the due-process requirement that the State prove each element of the offense charged.
Gentry III rejected the construction of "remains unlawfully" that is now adopted by the majority, in part because that construction *485 has the potential to make almost every murder committed indoors a capital murder, and nearly every crime that occurs indoors can be bootstrapped into a burglary simply by the fact of the commission of the crime. This is contrary to the historical concept of burglary, which required that the unlawfulness of the entryor, later, the unlawfulness of the remaining be proved separately from the intent to commit, or the act of committing, a crime inside the dwelling or building.
Furthermore, the decision to overrule Gentry III is unnecessary in this case and does not affect Davis's punishment, because he was also convicted of the capital offense of murder committed during a robbery. On both capital convictions, he received a sentence of life imprisonment without parole. The Court of Criminal Appeals affirmed the conviction and sentence on the robbery/murder charge. Under that sentence, Davis will remain in the penitentiary for the rest of his life.
As to the burglary/murder conviction, the majority of this Court is allowing a murder conviction to be made capital by allowing a jury to draw an inference of an implied revocation of a privilege to remain. Is an inference of an implied revocation a basis on which to "`genuinely narrow' the class of persons eligible for the death penalty so that capital punishment is reserved for the most egregious crimes"? Gentry III, 689 So.2d at 917, quoting Zant v. Stephens, 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235, 249-50 (1983).
The majority says that the difference between a capital crime and a noncapital murder in this context is whether there is evidence that the victim's death was "inflicted by surprise or stealth [and caused] instantaneous death," in which case the court could not submit the capital-burglary/murder charge to the jury because there would not be "circumstantial evidence of an unlawful remaining." 737 So.2d at 484. I foresee great difficulty in drawing the line between a capital-burglary/murder case, in which the inference of an implied revocation will be supported, and a noncapital case of an indoor murder, in which that inference will not be supported by the evidence. Moreover, this distinction is an inappropriate basis on which to distinguish "the most egregious crimes" from those that are not made capital.
The problem in these cases arises chiefly because the statutory offense of "burglary by unlawfully remaining" is so unlike the common-law crime of burglary. Even under the statutory offense, however, the State has the burden of proving a burglary. I adhere to the position stated in Gentry III that the State cannot meet its burden of proving a burglary simply by proving that a murder occurred in a building occupied by the victim. I think the majority errs in allowing the State to meet its burden of proving a burglary by showing that death was not instantaneous and that the victim struggled before dying. I understand the inference that, in those circumstances, the killer will understand that he is not welcome. However, even the expansive statutory element of "unlawfully remains" requires evidence of something more than a subjective thought by a killer that the occupant probably does not want him to stay. Section 13A-7-1(4), Ala.Code 1975, defines "Enter or remain unlawfully" as follows:
"A person `enters or remains unlawfully' in or upon premises when he is not licensed, invited or privileged to do so. A person who, regardless of his intent, enters or remains in or upon premises which are at the time open to the public does so with license and privilege unless he defies a lawful order not to enter or remain, personally communicated to him by the owner of such premises or other authorized person. A license or privilege to enter or remain in a building which is partly open to the public is not a license or privilege to enter or remain in that part of the building which is not open to the public. A person who enters or remains upon unimproved and apparently *486 unused land, which is neither fenced nor otherwise enclosed in a manner designed to exclude intruders, does so with license and privileges unless notice against trespass is personally communicated to him by the owner of such land or other authorized person, or unless such notice is given by posting in a conspicuous manner."
(Emphasis added.) Although the second sentence refers to premises that are open to the public, surely the principle stated therein would apply to a guest in a private residence, who does not become a burglar until he "defies a lawful order not to ... remain, personally communicated to him by the owner of such premises or other authorized person."
Because this definition requires communication to a person that he has no privilege to enter or remain, or that his privilege is revoked, the "inference of implied revocation" that is crucial to the proof of burglary in these cases must be an inference that the victim probably said "Get out!" or words to that effect. An inference that the victim "probably" communicated a revocation of privilege is just as tenuous as an inference of an implied revocation. Such an inference would be especially questionable here, because the victim "died from ligature strangulation." Davis v. State, 737 So.2d 474, 478 (Ala.Crim.App. 1997). Does the majority allow an inference that the victim told Davis to leave before he wrapped the cord around her neck, or an inference that, while he was strangling her, she somehow communicated the revocation of his privilege to remain, or does the majority simply hold that her struggle for life was an implied revocation of his privilege to be in her home?[2]
These inferences that the majority is allowing concern me. Essentially, a defendant is being "guessed" into a capital conviction. Alternatively, perhaps the majority thinks that killing a person in the victim's home should be a capital murder. However, there is no capital offense of "murder of a person in the person's home."[3] To prove the offense of "Murder by the defendant during a burglary in the first or second degree or an attempt thereof committed by the defendant," § 13A-5-40(a)(4), the State must prove a "burglary ... or an attempt thereof." Proof of a fatal assault is not proof of a burglary. There must be proof that the defendant "remain[ed] unlawfully in a dwelling with intent to commit a crime therein," § 13A-7-5(a), or "remain[ed] unlawfully in a building with intent to commit theft or a felony therein," § 13A-7-6(a). I simply do not think that an absence of proof of either an unlawful entry or an unlawful remaining can be overcome by evidence that the defendant committed an indoor crime of which the occupant of the premises was aware.
For these reasons, I dissent from the overruling Ex parte Gentry, 689 So.2d 916 (Ala.1996). I think the Court of Criminal *487 Appeals correctly, albeit reluctantly, followed Gentry in reversing Davis's conviction of the capital offense of murder committed during a burglary. I would affirm that court's reversal of that conviction. Because Davis's capital conviction for murder during the course of a robbery remains in effect, the reversal by the Court of Criminal Appeals does not affect Davis's actual punishment for the robbery/murder he was convicted of committing.
SHORES, KENNEDY, and COOK, JJ., concur.
NOTES
[1] It is undisputed that Harrington was murdered in her home. Thus, we confine our discussion to the issue whether the murder was committed during a burglary.
[*] Although Justice Almon, Justice Shores, and Justice Cook did not sit at oral argument of this case, they have listened to the tape of oral argument.
[2] I do not mean to be insensitive to the trauma of the victim by asking this question or, generally, by writing this dissent. I simply believe that I am bound to follow the legal requirement that the State has the burden of proving a criminal defendant guilty, beyond a reasonable doubt, of an offense that is sufficiently defined to give notice of what it prohibits. "[O]ne cannot commit an offense under a statute except in the circumstances it specifies." Peinhardt v. State, 161 Ala. 70, 73, 49 So. 831, 832 (1909), overruled on other grounds by Williams v. State, 177 Ala. 34, 58 So. 921 (1912). "[B]efore there may validly be the imposition of criminal sanctions in the form of fine or imprisonment, or both, there must be a crime defined and a crime committed." Nesmith v. Alford, 318 F.2d 110, 120 (5th Cir.1963), reh'g denied, 319 F.2d 859 (1963), cert. denied, Sullivan v. Nesmith, 375 U.S. 975, 84 S.Ct. 489, 11 L.Ed.2d 420 (1964). Surely these principles apply with the most force in determining whether an offense is capital.
[3] It would not be offensive to me personally if the legislature were to declare such a capital offense. Under the law as written, however, the capital offense is murder during the course of a "burglary ... or an attempt thereof," not murder of a person in that person's home.